**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NJSC NAFTOGAZ OF UKRAINE<br>6, B. Khmelnitskogo Str.<br>Kyiv, Ukraine, 01601<br><br>NATIONAL JOINT STOCK COMPANY<br>CHORNOMORNAFTOGAZ<br>26, B. Khmelnitskogo Str., office 505<br>Kyiv, Ukraine, 01030<br><br>JSC UKRTRANSGAZ<br>9/1, Klovskiy Uzviz<br>Kyiv, Ukraine, 01021<br><br>JSC UKRGASVYDOBUVANNYA<br>26/28, Kudriavska Str.<br>Kyiv, Ukraine, 04053<br><br>JSC UKRTRANSNAFTA<br>32/2 Knyaziv Ostrozkyh Str.<br>Kyiv, Ukraine, 01010<br><br>SUBSIDIARY COMPANY GAZ UKRAIINY<br>1, Sholudenka Str.<br>Kyiv, Ukraine, 04116<br><br>*Petitioners,*<br><br>        v.<br><br>THE RUSSIAN FEDERATION,<br>Ministry of Foreign Affairs<br>32/34 Smolenskaya-Sennaya Ploshchad<br>Moscow 119200, Russian Federation<br><br>*Respondent.* | Case No. _____ |

**PETITION TO CONFIRM FOREIGN ARBITRATION AWARD**

Petitioners NJSC Naftogaz of Ukraine, National Joint Stock Company Chornomornaftogaz, JSC Ukrtransgaz, JSC Ukrgasvydobuvannya, JSC Ukrtransnafta, and Subsidiary Company Gaz Ukraiiny (collectively, "Naftogaz" or the "Petitioners") state as follows:

## NATURE OF THE PROCEEDING

1.      The Petitioners are Ukrainian companies seeking confirmation of an arbitral award issued on April 12, 2023 (the "Final Award"), in favor of the Petitioners and against the Russian Federation (the "Russian Federation," "Russia," or the "Respondent").  The Final Award was rendered by a distinguished three-member arbitral tribunal seated in The Hague, the Netherlands (the "Tribunal").  The Final Award, together with a correction to the Final Award (the "Correction to the Final Award") issued on June 16, 2023, is attached as Exhibit A to the Declaration of David Z. Pinsky dated June 22, 2023 (the "Pinsky Decl.").

2.      The underlying dispute arises from the Russian Federation's unlawful expropriation of the Petitioners' investments in Crimea, including in the City of Sevastopol, following Russia's illegal annexation of that territory in 2014.  The Petitioners commenced the arbitration on October 14, 2016, under the dispute resolution provisions of the bilateral investment treaty between the Russian Federation and Ukraine, formally known as the Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated November 27, 1988 (the "Russia-Ukraine BIT" or the "Treaty").  *See* Pinsky Decl. Ex. B.  In the arbitration, Petitioners sought compensation for Russia's multiple, wide-ranging violations of the Treaty's substantive protections with respect to their investments in Crimea.

3.      On February 22, 2019, following briefing and a hearing on jurisdiction and liability, the Tribunal rendered a partial award dated February 22, 2019 (the "Partial Award"), in which it held, by majority, that it had jurisdiction over the Petitioners' claims and that the Russian Federation was liable to the Petitioners for its violations of the Russia-Ukraine BIT.  *See* Pinsky Decl. Ex. C.  The Partial Award on jurisdiction and liability forms an integral part of the Final Award.

2

4.      On April 12, 2023, following briefing by the parties on the matter of the amount of compensation due to the Petitioners and a further hearing on this issue, the Tribunal issued the Final Award, again by majority.   *See* Pinsky Decl. Ex. A (Final Award).  In the Final Award, the Tribunal ordered the Russian Federation to pay the Petitioners USD 4,222,875,858.81 in compensation, plus interest on this amount at the rate of 6-month EURIBOR +2% compounded semi-annually from March 18, 2014, until the date of full payment.[1]  *See* Pinsky Decl. Ex. A (Final Award) ¶¶ 716–717.  The Tribunal also ordered the Russian Federation to pay the Petitioners' costs in the arbitration, in the amount of USD 23,889,036.26 million and EUR 882,435.90, plus interest on these amounts at the rate of 6-month EURIBOR +2% compounded semi-annually from the date of the Final Award until full payment.  *Id.* ¶ 717.

5.      By letter to the Russian Federation dated May 16, 2023, the Petitioners requested payment of the sums outstanding under the Final Award.  *See* Pinsky Decl. Ex. D.  Russia has not responded to the Petitioners' request and has not paid any of the amounts ordered in the Final Award.  *See* Pinsky Decl. ¶ 6.

6.      The Final Award is subject to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), as implemented by the Federal Arbitration Act (the "FAA").  9 U.S.C. §§ 201–208.  The FAA provides that a "court shall confirm" an award falling under the New York Convention, "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  No ground for refusal or deferral of recognition or enforcement of the Final Award applies here.  This Court should accordingly confirm the Final Award.

---

[1] The Tribunal divided this principal amount among the Petitioners in amounts specified in the Final Award, which the Tribunal subsequently corrected in its Correction to the Final Award.  *See infra* ¶ 51.

## PARTIES, JURISDICTION, AND VENUE

7.      The Petitioners are companies organized under the laws of Ukraine and engaged in the exploration, production, transport, storage, processing, and sale of oil and gas. The Petitioners were the claimants in the arbitration that resulted in the Final Award.

8.      The Respondent is the Russian Federation, a "foreign state" as defined in the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1603. The Russian Federation was the respondent in the arbitration.

9.      This Court has original jurisdiction over the subject matter of this proceeding because it is an "action or proceeding falling under the [New York] Convention" and is therefore "deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203.

10.     This Court also has subject matter jurisdiction to confirm an arbitration award against a foreign state in accordance with the FSIA. 28 U.S.C. §§ 1330(a), 1605. The Russian Federation is not immune from this Court's jurisdiction because this is an action to confirm an arbitration award that is governed by the New York Convention, a "treaty . . . calling for the recognition and enforcement of arbitral awards" that is in force in the United States. 28 U.S.C. § 1605(a)(6); *see also Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 776 (D.C. Cir. 2022) ("[T]he New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception [under 28 U.S.C. § 1605(a)(6)]." (internal citations and quotation marks omitted)).

11.     The Russian Federation is also not entitled to sovereign immunity from jurisdiction because, as a signatory to the New York Convention that agreed to arbitrate in the Netherlands, also a state party to the New York Convention, the Russian Federation "has waived its immunity . . . by implication." 28 U.S.C. § 1606(a)(1); *see also Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 192 (D.D.C. 2018) (holding that Ukraine impliedly waived its immunity under Section 1605(a)(1),

because, as a signatory to the New York Convention and having "agreed to arbitrate in the territory of a state . . . that has signed the New York Convention," it "should have anticipated enforcement actions in signatory states"), *aff'd*, 771 F. App'x 9 (D.C. Cir. 2019), *cert denied sub nom. Ukraine v. PAO Tatneft*, 140 S. Ct. 901 (2020).

12.     This Court may exercise personal jurisdiction over the Russian Federation under 28 U.S.C. § 1330(b).

13.     Venue in this district is proper under 28 U.S.C. § 1391(f)(4), which provides that a civil action against a "foreign state" may be brought in the U.S. District Court for the District of Columbia.

14.     This petition is timely because it was filed "[w]ithin three years" after the Final Award—"an arbitral award falling under the [New York] Convention"—was issued on April 12, 2023.  9 U.S.C. § 207.

## FACTUAL BACKGROUND

## I.     THE UNDERLYING DISPUTE

15.     The Petitioners are six Ukrainian state-owned or state-controlled entities operating in Ukraine's oil and gas sector.  They each act as independent commercial entities.  As of February 2014, the Petitioners were the largest participants in natural gas exploration, production, transport, storage, processing, and distribution in Crimea.   Pinsky Decl. Ex. C (Partial Award) ¶ 4. Accordingly, the Petitioners maintained substantial investments in Crimea, including: a number of valuable special permits for subsoil use; significant equipment and infrastructure for the exploration, development, and production of gas and other natural resources; ownership interests

in gas pipelines within the territory; and over 675-million cubic meters of stored gas, among other things.  *See* Pinsky Decl. Ex. C (Partial Award) ¶¶ 69–80.

16.     In late February 2014, the Russian Federation invaded and occupied Crimea.  The invasion began on February 20, 2014, when Russia launched a military operation to seize that territory.  *See id.* ¶ 85.  By February 27, 2014—a day Russia later declared "Special Operations Forces Day"—unidentified armed men had taken control of the Crimean Parliament building in Simferopol, the regional capital, and hoisted a Russian flag over the building, while Russian troops took control of the civilian airport in Simferopol and the military airport at Sevastopol.  *Id.* ¶ 87.

17.     Also on this date, a pro-Russian politician, Sergey Aksyonov, was installed as the new Prime Minister of the Autonomous Republic of Crimea, a constituent unit within the internationally recognized borders of Ukraine, and the Crimean Parliament "purported to vote to hold a referendum on the independence of Crimea, behind closed doors where journalists were excluded and Members of the Crimean parliament had their cell phones confiscated."  *Id.* ¶ 88 (internal quotations omitted).  The Crimean Parliament would later vote for Crimea "[t]o become part of the Russian Federation as a Constituent Entity" and scheduled a referendum to take place on March 16, 2014.  *Id.* ¶ 90.  Aides to Russian President Vladimir Putin helped organize the referendum.  *Id.*

18.     On March 15, 2014, "the Ukrainian Parliament stripped the Crimean Parliament of its powers."  *Id.* ¶ 91.  Consequently, "[m]easures subsequently adopted by the Crimean Parliament were without legal authority or legal effect," and such authority was "[r]estored only when legislative powers were conferred by the Russian Federation, effective 18 March 2014."  *Id.*

19.     Having been stripped of its authority under Ukrainian law, on March 17, 2014, the purported Parliament of the "Republic of Crimea" took two actions of particular significance to

the Petitioners' case.  First, the Crimean Parliament enacted Resolution No. 1745-6/14 (the "Independence Resolution"), proclaiming that a so-called Republic of Crimea was an independent sovereign state and purporting to strip Ukraine and enterprises owned by Ukraine of their property rights.  Pinsky Decl. Ex. C (Partial Award) ¶¶ 93, 225–227.  Second, the Crimean Parliament issued Resolution No. 1758-6/14 (the "Nationalization Resolution") targeting by name certain commercial enterprises and their investments, including Naftogaz's investments, for nationalization.  *See id*. ¶¶ 108–109, 225–227.  Through these measures, among others, "the Crimean Parliament had purported to seize the [Petitioners'] assets." *Id*. ¶ 225.  These initial measures were later followed by additional legislative and administrative steps that nationalized the remainder of the Petitioners' assets. *See id*. ¶¶ 111–125, 257–264.

20.     On March 18, 2014, the Russian Federation and the Republic of Crimea agreed to a treaty purporting to formalize Crimea's admission to the Russian Federation (the "Annexation Treaty"). *Id*. ¶ 94.  On March 21, 2014, the Russian Parliament formally ratified the Annexation Treaty—which was made effective as of the date of the Annexation Treaty, i.e., March 18, 2014. *Id*. ¶ 226.

21.     Also on March 21, 2014, the Russian Parliament enacted a constitutional law titled "On the Admission of the Republic of Crimea to the Russian Federation, and the Formation of New Constituent Entities within the Russian Federation—The Republic of Crimea and the Federal City of Sevastopol" (the "Law on Admission"), which purported to "admit[] the Republic of Crimea and the Federal City of Sevastopol to the Russian Federation effective 18 March 2014." *Id*. ¶¶ 6, 96.  This Law on Admission "created the necessary constitutional authority to adopt and ratify the seizure which Russia accomplished, incrementally, from and after 18 March 2014." *Id*. ¶ 231.  As the Majority explained, "[t]he expropriation [of Naftogaz's assets] was achieved only

by force of the Russian legislation which enacted the previously unauthorized laws of the dis-empowered Crimean legislature."  Pinsky Decl. Ex. C (Partial Award) ¶ 230.

22.     In the months after March 2014, the Crimean Parliament—now operating with the authority conferred upon it under Russian law—took a series of additional legislative acts that targeted and nationalized the remainder of the Petitioners' investments in Crimea.  *See id.* ¶¶ 123–125, 257–264.  Alongside these legislative acts, the Petitioners' investments were also the subject of physical interference.  *See id.* ¶¶ 110–122.  For example, armed men had arrived at the offices of Petitioner Chornomornaftogaz as early as March 18, 2014 and, starting in mid-April 2014 until February 2015, Russian troops were present on Petitioner Chornomornaftogaz's self-elevating jack-up drilling rigs in the Black Sea.  *Id.* ¶¶ 110, 122.

## II.     THE RUSSIA-UKRAINE BIT

23.     The Russia-Ukraine BIT is concerned with "encouragement and mutual protection of investments."  Pinsky Decl. Ex. B (Treaty).  The Treaty applies "to all investments made by investors of one Contracting Party in the territory of the other Contracting Party, on or after January 1, 1992."  *Id.*, Art. 12.

24.     Under the terms of the Treaty, each Contracting Party agreed to provide certain standards of protection to investments in its territory made by investors of the other Contracting Party.  *See generally id.*, Arts. 2–7.  Russia therefore guaranteed Ukrainian investments in the territory of the Russian Federation protection against expropriation of protected investments without due process of law and prompt, adequate, and effective compensation.  *See id.*, Art. 5.

25.     The Russia-Ukraine BIT contains a standing offer to arbitrate "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments."  *Id.*, Art. 9(1); *see also id.,* Art. 9(2); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 66 (D.D.C. 2013) (explaining that a sovereign's accession to an investment

treaty that provides for arbitration "constitutes a standing offer to arbitrate disputes covered by the Treaty; a foreign investor's written demand for arbitration completes the 'agreement in writing' to submit the dispute to arbitration." (quoting *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392–93 (2d Cir. 2011))), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015).

## III.   THE ARBITRATION

### A.   Constitution of the Tribunal and Establishment of the Procedural Timetable

26.    Consistent with the terms of the Russia-Ukraine BIT, on February 15, 2016, the Petitioners notified the Russian Federation of the existence of a dispute under Article 9 of the Treaty, arising from Russia's mistreatment of the Petitioners' investments in Crimea. Pinsky Decl. Ex. A (Final Award) ¶ 13. The Respondent did not respond to the Petitioners' Notice of Dispute. *Id.* Six months later, on October 17, 2016, consistent with Article 9(2)(c) of the Treaty and the 1976 Arbitration Rules of the United Nations Commission for International Trade Law (the "UNCITRAL Rules"), the Petitioners commenced arbitration by serving a Notice of Arbitration on the Respondent. *Id.* ¶ 14.

27.    The Petitioners appointed Dr. Charles Poncet, a citizen of Switzerland, as their party-appointed arbitrator. Pinsky Decl. Ex. A (Final Award) ¶ 15. When the Respondent failed to appoint an arbitrator within 30 days of receiving notice of Dr. Poncet's appointment, the Petitioners requested that the Secretary General of the Permanent Court of Arbitration (the "PCA"), the authority administering the arbitration, appoint an arbitrator on the Respondent's behalf, in accordance with Article 7(2) of the UNCITRAL Rules. *Id.* ¶ 16. On December 16, 2016, the Secretary General designated Dr. Michael Hwang as the appointing authority after requesting but not receiving comments from the Respondent. *Id.* ¶ 17. By a letter dated January 22, 2017, the Petitioners requested that Dr. Hwang appoint an arbitrator on the Respondent's behalf. *Id.* ¶ 18.

28.     On February 3, 2017, the PCA received a letter from Ms. O.V. Zentsova, the Deputy Director of the Department of International Law and Cooperation in the Ministry of Justice of the Russian Federation, in which Russia objected "to the constitution of an arbitral tribunal to hear the present dispute, the jurisdiction of the Tribunal, and to the admissibility of the [Petitioners'] claims." Pinsky Decl. Ex. A (Final Award) ¶ 19. The Russian Federation then declined to participate in the proceedings until *after* the issuance of the Partial Award. *Id.* ¶ 67. In spite of Russia's decision not to participate, the Tribunal notified Russia of all significant procedural steps in the arbitration and provided Russia the opportunity to comment on all material issues—Russia nonetheless declined to do so. *See generally id.* ¶¶ 25–66.

29.     By a letter of February 13, 2017, the Petitioners denied the Russian Federation's contentions set out in Ms. Zentsova's letter and reiterated their request that Dr. Hwang appoint an arbitrator on Russia's behalf. *Id.* ¶ 22. On February 14, 2017, Dr. Hwang, on behalf of the Respondent, appointed as the second arbitrator Professor Dr. Maja Stanivuković, a citizen of Serbia, in accordance with Article 7(2)(b) of the UNCITRAL Rules. *Id.* ¶ 23. On April 13, 2017, after requesting but not receiving comments from the Respondent, Dr. Hwang appointed Judge Ian Binnie, C.C., K.C., a citizen of Canada, as the presiding arbitrator, in accordance with Articles 7(3) and 6(3) of the UNCITRAL Rules. *Id.* ¶ 24.

30.     On July 19, 2017, the Tribunal issued Procedural Order Nos. 1 and 2, which appointed the PCA to act as the registrar and administrator of the arbitral proceedings, established The Hague in the Netherlands as the place of arbitration, and set forth a Procedural Timetable according to which the issues of jurisdiction, admissibility, liability, and quantum would be heard together. *Id.* ¶¶ 26–27. Section 2.2 of Procedural Order No. 2 provided for an accelerated timetable in case the Respondent did not respond. *Id.* ¶ 27.

31.     After receiving a Proposed Confidentiality Order from the Petitioners on August 11, 2017, and requesting, but not receiving, comments from the Respondent on that proposed order, the Tribunal issued a Confidentiality Order on August 30, 2017.  Pinsky Decl. Ex. A (Final Award) ¶¶ 28–30.

**B.      Bifurcation and Proceedings on Jurisdiction and Liability**

32.     On September 15, 2017, the Petitioners submitted their Statement of Claim and accompanying exhibits, witness statements, and expert reports. *Id*. ¶ 31.  Also on September 15, the Petitioners submitted a request that certain exhibits be designated as "Highly Confidential Information," which would be provided only to the Tribunal and the parties' outside counsel according to the Tribunal's Confidentiality Order. *Id*.  Due to a concern about "the [Petitioners'] request to file the 'Highly Confidential' documents without disclosure to the Respondent"—which was not then represented by counsel and would therefore not receive documents that might lead to an Award against it—and because most of the exhibits in question concerned the Petitioners' damages, the Tribunal suggested that the Petitioners apply to bifurcate the proceeding. *Id*. ¶ 33.

33.     By a letter of November 9, 2017, the Petitioners requested that the Tribunal bifurcate the proceeding into two phases: the first devoted to jurisdiction and liability, and the second to the resolution of damages. *Id*. ¶ 34.  Having requested but not received comments from the Respondent on the proposal to bifurcate, the Tribunal issued Procedural Order No. 4 on December 8, 2017, which provided that the issues of jurisdiction and liability would be addressed at a hearing held on May 14 to 18, 2018, and the issue of quantum would be addressed, if necessary, at a later date. *Id*. ¶ 35.

34.     The Respondent failed to submit a Statement of Defense by January 5, 2018, the deadline set by the Tribunal in Section 2.1 of Procedural Order No. 2. *Id*. ¶ 37.  Notwithstanding the Respondent's failure to respond, the Tribunal ordered the proceeding to continue in accordance

with Article 28(1) of the UNCITRAL Rules.  Pinsky Decl. Ex. A (Final Award) ¶ 38.  As a result of the Respondent's failure to respond, the Tribunal issued Questions to the Parties on January 12, 2018, to which the Petitioners provided answers, accompanied by exhibits, legal authorities, and expert reports, on February 23, 2018.  *Id.* ¶¶ 39–40.  The Respondent did not respond to the Tribunal's Questions.  *Id.*

35.     The hearing on jurisdiction and liability occurred from May 14 to 17, 2018, in The Hague.  *Id.* ¶ 47.  The Russian Federation, "although duly notified of the schedule and having been invited to participate, did not take part in the hearing."  *Id.*  The Petitioners delivered their closing statement in response to Questions to the Parties issued by the Tribunal during the hearing.  *Id.* ¶¶ 48–49.

36.     On February 22, 2019, the Tribunal issued its Partial Award on jurisdiction and liability, in which it ruled, by majority, "that the Tribunal has jurisdiction over the claims," and "that the [Petitioners] have established a violation of Article 5 (expropriation) and Article 2(1) (full and unconditional legal protection) and Article 3(1) (most favored nation treatment) of the BIT."  *Id.* ¶¶ 64–65.  Russia's party-appointed arbitrator, Professor Stanivuković, was in dissent. The Tribunal declared that it would "proceed to the quantum phase of the arbitration."  *Id.* ¶ 66.

### C.     The Respondent's Efforts to Set Aside the Partial Award

37.     On June 21, 2019, the Russian Federation sought to set aside the Partial Award in the Netherlands, commencing annulment proceedings before The Hague Court of Appeal.  *See* Pinsky Decl. Ex. E (Set-Aside Judgment) ¶ 1.1.

38.     On July 10, 2019, shortly after the Russian Federation commenced set aside proceedings in the Netherlands, Russia addressed the Tribunal for the first time to express its willingness to participate in the arbitration and made three requests: (i) to permit the Respondent to raise jurisdictional objections; (ii) to stay the arbitration pending the annulment proceedings

before The Hague Court of Appeal; and (iii) to grant the Respondent the opportunity to raise objections to the claim on the merits and in relation to quantum. Pinsky Decl. Ex. A (Final Award) ¶ 67.

39.     On August 21, 2019, the Tribunal issued Procedural Order No. 7, directing the Respondent to file a formal application addressing the Tribunal's authority to entertain further submissions in respect of jurisdictional "issues not already dealt with in the Partial Award." *Id.* ¶ 72. The Tribunal also rejected Russia's request to stay the proceedings, and, with the observation that "the merits stage of the arbitration was closed by the Partial Award," invited the Respondent to submit its Counter-Memorial on Quantum in accordance with the procedural timetable. *Id.*

40.     The Russian Federation requested "a reasonable extension of time for the filing of the Counter-Memorial on Quantum" on August 28, 2019, and filed its Request for the Tribunal to use its Authority to Entertain Further Submissions on Jurisdiction on September 6, 2019. *Id.* ¶¶ 73–74. Following comments from the parties with respect to both requests, on October 6, 2019, the Tribunal issued Procedural Order No. 8, which denied the Respondent's request to reopen the hearing on jurisdictional objections but amended the procedural timetable for the quantum phase of the proceedings. *Id.* ¶ 84.

41.     As regards the Russian Federation's parallel efforts to set aside the Partial Award, the Tribunal explained in the Final Award that, in a judgment dated July 19, 2022 (as corrected on October 18, 2022), The Hague Court of Appeal "determined that assets had indeed been invested by the [Petitioners] being investors of a Contracting Party, in the territory of the other Contracting Party in accordance with the legislation of the other Contracting Party" and "confirmed the Tribunal's jurisdiction to determine which assets are 'protected investments' and which are not." Pinsky Decl. Ex. A (Final Award) ¶¶ 296, 306. The Hague Court of Appeal also observed that the

Tribunal "has jurisdiction only to rule on investments made on or after January 1, 1992" and partially set aside the Partial Award "only insofar as the arbitral tribunal has found that it has jurisdiction over all claims." Pinsky Decl. Ex. E (Set-Aside Judgment) ¶ 5.7.6; *see also* Pinsky Decl. Ex. A (Final Award) ¶¶ 5–6 (citing the Set-Aside Judgment and The Hague Court of Appeal's jurisdictional decision).

42.     On October 19, 2022, the Respondent appealed the Set Aside Judgment to the Supreme Court of the Netherlands. Pinsky Decl. ¶ 7. On January 12, 2023, the Petitioners filed a cross-appeal in those appeal proceedings. *Id*. On February 9, 2023, the Respondent submitted its pro forma Statement of Defence. *Id*. The parties filed written explanations of their respective positions on May 26, 2023. *Id*.

**D.     Proceedings on Quantum and the Issuance of the Final Award**

43.     On June 27, 2019, the Petitioners submitted their Memorial on Quantum and accompanying exhibits and expert reports. Pinsky Decl. Ex. A (Final Award) ¶ 87. The Respondent submitted its Counter-Memorial on Quantum and accompanying exhibits and expert reports on December 6, 2019. *Id*. ¶ 88. On December 18, 2019, the Petitioners requested that the Tribunal strike certain sections of the Counter-Memorial on Quantum on the grounds that they contained jurisdictional and liability arguments precluded by the Partial Award. *Id*. ¶ 89. Following comments from the Respondent, the Tribunal issued Procedural Order No. 9 on January 9, 2020, granting Petitioners' request in part and denying their request in part. *Id*. ¶ 92. Among others, the Tribunal did not strike sections regarding the temporal limitation in Article 12 of the BIT, noting that "[t]he issue is an important one and will not be decided in a summary way." *Id*.

44.     On February 14, 2020, Petitioners submitted their Reply on Quantum and accompanying exhibits and expert reports. *Id*. ¶ 94. Following multiple extensions of time, the Respondent submitted its Rejoinder on Quantum and accompanying exhibits and expert reports on

June 3, 2020.  *See generally* Pinsky Decl. Ex. A (Final Award) ¶¶ 102, 113, 116.  On June 18, 2020, the Petitioners requested that the Tribunal strike from the record certain sections of the Rejoinder on Quantum on the grounds that Russia introduced new arguments and evidence that were not responsive to fresh matters raised in the Reply.  *Id.* ¶ 118.  Following comments from the parties, on August 10, 2020, the Tribunal issued Procedural Order No. 13, which denied the Petitioners' request to strike but permitted the Petitioners to submit a response limited to matters raised in the Respondent's Rejoinder on Quantum.  *Id.* ¶ 134.  Accordingly, the Tribunal also granted the Respondent's request to file a sur-rebuttal to the Petitioners' submission, if any.  *Id.*

45.     On September 7, 2020, the Petitioners submitted their Response to Matters Raised in the Rejoinder on Quantum and accompanying exhibits and expert reports.  *Id.* ¶ 140.  Following an extension granted by the Tribunal, the Respondent filed its Sur-Rebuttal on Quantum and accompanying exhibits and expert reports on November 16, 2020.  *Id.* ¶ 152.

46.     The hearing on quantum occurred from February 21 to March 2, 2022, in The Hague, the Netherlands.  *Id.* ¶ 228.  Although the Tribunal initially requested submission of two rounds of simultaneous post-hearing briefs, following comments from the parties, the Tribunal issued Procedural Order No. 20 on May 10, 2022, in which it ordered the "deletion" of the post-hearing submissions.  *Id.* ¶¶ 231, 245.  On June 17, 2022, the parties filed their respective submissions on costs and accompanying exhibits.  *Id.* ¶ 252.

47.     On August 31, 2022, the Respondent requested *inter alia* that the Tribunal reopen the jurisdictional phase of the arbitration in response to the Set Aside Judgment of The Hague Court of Appeal.  *Id.* ¶ 266.[2]  Following the submission of comments on Dutch law from both parties, the Tribunal issued Procedural Order No. 21 on December 5, 2022, in which it dismissed

_____

[2] *See* discussion *supra* Section III.C.

the Respondent's request "without prejudice to the entitlement of the Respondent to have the impact of the Article 12 of the BIT limitations considered by the Tribunal in all relevant aspects of its consideration of its determination of the proper quantum of compensation." Pinsky Decl. Ex. A (Final Award) ¶ 274. On December 12, 2022, the parties submitted their respective supplemental submissions on costs, which included legal fees incurred in the additional post-hearing submissions. *Id*. ¶ 277.

## IV.   THE AWARD

48.     On April 12, 2023, the Tribunal issued the Final Award on quantum. In the Final Award, the Tribunal—by majority (the "Majority")—determined that "the quantum of compensation due to the [Petitioners] based on the Fair Market Value of the [Petitioners'] expropriated investments in Crimea on the Valuation Date is USD 4,222,875,858.81." *Id*. ¶ 716. The Majority further awarded interest on this amount "at the rate of 6-month EURIBOR +2 percent compounded semi-annually from the Valuation Date (17/18 March 2014) until the date of the payment." *Id*. ¶¶ 698, 717. Again, Russia's party-appointed arbitrator, Professor Stanivuković, dissented.

49.     In arriving at this conclusion, the Majority thoroughly considered the effect of Article 12 of the BIT on the scope of protected investments. *See id*. ¶¶ 297–362. In particular, the Tribunal concluded that (i) the Petitioners could not have made "investments" before their incorporation in 1998; (ii) Naftogaz actively "made" investments on Russian territory; (iii) the transfer of state assets to the charter capital of the Petitioners was a transfer of the property in such assets; (iv) Article 12 does not exclude the upstream oil and gas assets discovered or initiated in the Soviet-era by Soviet entities, since the Petitioners' "claim relates to the permits issued after 1998 that were valid and existing at the date of the unlawful expropriation," *id*. ¶ 352; and (v)

compensation must not be discounted to account for estimated expenditures by predecessors in title prior to January 1, 1992.

50.     The Majority next addressed the law applicable to the assessment of damages for the Petitioners' interest in special permits under which they were permitted to develop and exploit the underlying oil and gas fields and prospects (the "Upstream Assets"), which represented the majority of the value of Petitioners' claims. *See* Pinsky Decl. Ex. A (Final Award) ¶¶ 363–370. The Majority agreed with the Respondent that Russian law, as opposed to Ukrainian law, was applicable to the valuation of the Upstream Assets because the incorporation of Crimea into the Russian Federation on the Valuation Date, which the Tribunal set as March 17/18, 2014, "was merely a formality and all but certain." *Id*. ¶ 367; *see also id*. ¶ 7 (defining "Valuation Date"). The Majority accordingly went on to value the Petitioner's Upstream Assets by reference to a Russian legal framework, the application of which was assessed by the Tribunal based on the testimony of the parties' experts in Russian law. *See generally id*. ¶¶ 371–433.

51.     Finally, the Majority assessed the quantum of damages that the Respondent must pay to the Petitioners for the unlawful expropriation of the Petitioners' investments. After a detailed analysis, the Majority awarded the Petitioners "compensation in the amount of USD 4,222,875,858.81 plus interest on this amount at the rate of 6-month EURIBOR +2% compounded semi-annually from 18 March 2014 until the date of full payment,"[3] *id*. ¶ 717, in the following principal amounts:

a. to NJSC Naftogaz of Ukraine: USD 350,345,560.81;

b. to National Joint Stock Company Chornomornaftogaz: USD 2,883,980,000.00;

---

[3] Based on the Final Award, the Petitioners calculate the amount of interest owed by Respondents as of today's date as equal to approximately $840 million.

    c.   to JSC Ukrtransgaz: USD 46,129,914.00;

    d.   to JSC Ukrgasvydobuvannya: USD 941,722,120.00[4];

    e.   to JSC Ukrtransnafta: USD 652,890.00; and

    f.   to Subsidiary Company Gaz Ukraiiny: USD 45,374.00.

Pinsky Decl. Ex. A (Correction to the Final Award) ¶ 7.

52.    The Majority also awarded the Petitioners "USD 23,889,036.26 and EUR 882,435.90 in reimbursement of the costs of arbitration, including the [Petitioners'] reasonable costs of legal representation and assistance, plus interest on these amounts at the rate of 7-month EURIBOR +2% compounded semi-annually from the date of this Final Award until the date of full payment." Pinsky Decl. Ex. A (Final Award) ¶ 717. The Majority dismissed all other claims, counterclaims, and requests for relief. *Id.*

## ARGUMENT

## I.    THE NEW YORK CONVENTION APPLIES TO THE FINAL AWARD.

53.    The Final Award is subject to the New York Convention, as codified by Chapter 2 of the FAA. 9 U.S.C. §§ 201–208. The United States is a party to the New York Convention. *See Contracting States*, New York Convention, https://www.newyorkconvention.org/countries. The Russian Federation, the Respondent in the arbitration, is also a party to the New York Convention, as is the Netherlands, where the Final Award was made. *See id.*

54.    The FAA provides that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a

---

[4] This amount includes USD 925,917.00 of assets owned by Likvo LLC (previously a claimant in the arbitration), Pinsky Decl. Ex. A (Correction to the Final Award) ¶ 7, since JSC Ukrgasvydobuvannya is the legal successor to that entity, *see* Pinsky Decl. Ex. A (Final Award) ¶¶ 120–22 (explaining that the Tribunal removed Likvo LLC as a claimant in the arbitration at the request of the Petitioners after "the Claimant, Likvo LLC, had been terminated and merged into another Claimant, JSC Ukrgasvydobuvannya, effective 29 April 2020").

transaction, contract, or agreement . . . falls under the Convention," unless it arises out of the relationship between citizens of the United States and lacks a foreign nexus. 9 U.S.C. § 202.

55.     The Final Award, which determined the quantum of damages due to the Petitioners for the Respondent's violations of the Russia-Ukraine BIT, arises out of the Petitioners' investments in Crimea and thus arises out of a legal relationship that is commercial in nature. Neither party to the arbitration is a United States citizen, the underlying arbitration has no significant connection to the United States, and the Final Award was made in the Netherlands. The Final Award therefore "falls under the [New York] Convention." 9 U.S.C. § 202. Indeed, courts in this Circuit routinely confirm arbitral awards under the FAA and New York Convention where they have been issued following an arbitration that took place under the terms of a bilateral investment treaty. *See, e.g.*, *PAO Tatneft v. Ukraine*, No. 17-582 (CKK), 2020 WL 4933621, at *11 (Aug. 24, 2020) (confirming arbitral award issued under the Russia-Ukraine BIT), *aff'd sub nom. Tatneft v. Ukraine*, 21 F.4th 829, 841 (D.C. Cir. 2021); *Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*, 244 F. Supp. 3d 100, 105 (D.D.C. 2017) (granting petition to confirm arbitral award issued under the Canada-Venezuela BIT), *aff'd*, 760 F. App'x 1 (D.C. Cir. 2019); *Chevron*, 949 F. Supp. 2d at 73 (confirming arbitral award issued under the United States-Ecuador BIT).

## II.    THERE IS NO BASIS UNDER THE NEW YORK CONVENTION FOR THE COURT TO DENY CONFIRMATION OF THE FINAL AWARD.

56.     The New York Convention provides that Contracting States "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the . . . articles [of the Convention]." New York Convention, Art. III. Consistent with the New York Convention, the FAA provides that recognition and enforcement of a foreign arbitral award is mandatory unless

the court "finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention" applies. 9 U.S.C. § 207.

57.     Article V of the New York Convention thus sets forth the exclusive grounds on which a court may refuse to confirm an award. *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (citing *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007)).  Since the New York Convention "provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).  Moreover, the party opposing confirmation bears the burden of proof for establishing facts sufficient to deny confirmation.  *Id*. (citation omitted).  Further, this Court has held that "[t]he showing required to avoid summary confirmation is high."  *Id*.

58.     None of the grounds to deny recognition or enforcement apply here.  The Majority has found that the Russian Federation consented to the arbitration of disputes with Ukrainian investors such as the Petitioners.  *See* Pinsky Decl. Ex. C (Partial Award) ¶ 182; Pinsky Decl. Ex. A (Final Award) ¶ 1 (restating the dispositive part of the Partial Award, finding jurisdiction over the Petitioner's claims); *see also* New York Convention, Art. V(1)(a).

59.     The Russian Federation received adequate notice of the arbitration and of all material procedural developments throughout the arbitration, notwithstanding its initial decision not to participate in proceedings.  *See* Pinsky Decl. Ex. A (Final Award) ¶¶ 13–282 (describing the procedural history of the arbitration); *see also* New York Convention, Art. V(1)(b).  The arbitration—including the appointment of arbitrators—was conducted at all times in a manner consistent with principles of due process and fairness, and was in accordance with the parties' agreement, as reflected in the Russia-Ukraine BIT and the UNCITRAL Rules.  *See* New York

Convention, Arts. V(1)(b), V(1)(d).  Russia was able to present its case and participate fully in the proceedings.   Indeed, Russia submitted written pleadings totaling hundreds of pages and participated in the quantum hearing that took place in February 2022.  *See* Pinsky Decl. Ex. A (Final Award) ¶¶ 67–282 (describing Russia's participation in the proceedings).

60.     The Final Award concerns only matters within the scope of the Russia-Ukraine BIT's arbitration provision, which covers "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments."  Pinsky Decl. Ex. B (Treaty), Art. 9(1); *see also* New York Convention, Art. V(1)(c).  The Final Award establishes the quantum of damages owing to Petitioners for the Russian Federation's violations of the substantive investment protections owed to the Petitioners' investments and reflected in the Russia-Ukraine BIT.  Pinsky Decl. Ex. A (Final Award) ¶ 717.  Moreover, the Final Award is final and binding and has not been set aside by the Dutch courts, which are the competent authority of the country in which the Final Award was made.  *See* New York Convention, Art. V(1)(e).

61.     Finally, the parties' dispute would have been capable of settlement by arbitration under the law of the United States, because the United States recognizes the use of investor-state dispute settlement under a bilateral investment treaty as a means to recover monetary loss suffered as a result of sovereign misconduct.  Recognition of the Final Award would also not be contrary to any public policy of the United States.  *See* New York Convention, Art. V(2); *see also Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 (D.C. Cir. 2017) ("[T]he public policy defense is to be construed narrowly to be applied only where enforcement would violate the [United States'] most basic notions of morality and justice." (alteration in original) (citations and quotation marks omitted)).

**CONCLUSION**

62.     For the foregoing reasons, the Petitioners respectfully request immediate confirmation, recognition, and enforcement of the Final Award in accordance with the FAA and the New York Convention, entry of judgment in favor of the Petitioners and against the Respondent, the Russian Federation, and such further relief as the Court may deem just and proper.

WHEREFORE, Petitioners respectfully request that the Court enter an order:

A.     Recognizing and confirming in its entirety the Final Award issued on April 12, 2023, together with the Correction to the Final Award issued on June 16, 2023, which are attached as Exhibit A to the accompanying Declaration of David Z. Pinsky;

B.     Directing judgment to be entered for Petitioners in the total amount of USD 4,222,875,858.81 in damages, plus interest at the rate of 6-month EURIBOR +2% compounded semi-annually from March 18, 2014 until the date of full payment, with the principal balance divided among Petitioners as provided for in the Final Award in the following amounts:

     i.     to NJSC Naftogaz of Ukraine: USD 350,345,560.81;

     ii.    to National Joint Stock Company Chornomornaftogaz: USD 2,883,980,000.00;

     iii.   to JSC Ukrtransgaz: USD 46,129,914.00;

     iv.    to JSC Ukrgasvydobuvannya: USD 941,722,120.00;

     v.     to JSC Ukrtransnafta: USD 652,890.00;

     vi.    to Subsidiary Company Gaz Ukraiiny: USD 45,374.00;

C.     Directing judgment to be entered for Petitioners in the amounts of USD 23,889,036.26 and EUR 882,435.90 in reimbursement of the costs of arbitration, including the Petitioners' reasonable costs of legal representation and assistance, plus interest on these amounts at the rate of 6-month EURIBOR +2% compounded semi-annually from the date of the Final Award (i.e., April 12, 2023) until the date of full payment; and

D.     Granting such other and further relief as the Court may deem just and proper.

Dated: June 22, 2023                          Respectfully submitted,


                                               /s/ David Z. Pinsky
                                              David Z. Pinsky (DC Bar No. NY0525)
                                              Paris Aboro (DC Bar No. NY0519)
                                              COVINGTON & BURLING LLP
                                              The New York Times Building
                                              620 Eighth Avenue
                                              New York, NY 10018-1405
                                              (212) 841-1000
                                              dpinsky@cov.com
                                              paboro@cov.com

                                              William T. Lowery (DC Bar No. 1044896)
                                              Clovis Trevino (DC Bar No. 977672)
                                              COVINGTON & BURLING LLP
                                              One CityCenter
                                              850 Tenth Street, NW
                                              Washington, DC 20001-4956
                                              (202) 662-6000
                                              wlowery@cov.com
                                              ctrevino@cov.com

                                              *Counsel for Petitioners NJSC Naftogaz of
                                              Ukraine, National Joint Stock Company
                                              Chornomornaftogaz, JSC Ukrtransgaz, JSC
                                              Ukrgasvydobuvannya, JSC Ukrtransnafta,
                                              Subsidiary Company Gaz Ukraiiny*